IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

|  |  |  |
|---|---|---|
| Jacqueline D. Smith, | ) | Civil Action No. 8:10-cv-2624-CMC -JDA |
| Plaintiff, | ) |  |
|  | ) | **REPORT AND RECOMMENDATION** |
|  | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) |  |
|  | ) |  |
| Michael J. Astrue, | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and Title 28, United States Code, Section 636(b)(1)(B).[1] Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

In June 2007, Plaintiff protectively filed applications for DIB and SSI, alleging an onset of disability date of August 12, 2006.[3] [R. 111–24.] The claims were denied initially on November 28, 2007 [R. 45–48, 59–64] and were denied on reconsideration by the Social Security Administration ("the Administration") on February 12, 2008. [R. 49–52, 68–71]. On February 29, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ") [R. 73], and on August 14, 2009, ALJ Ann G. Paschall conducted a de novo hearing on Plaintiff's claims [R. 20–42].

The ALJ issued a decision on October 21, 2009, finding Plaintiff was not disabled within the meaning of the Social Security Act from August 12, 2006 through the date of the decision. [R. 10–19.] The ALJ found Plaintiff had severe impairments of congenital heart defects, sleep apnea, anxiety, and depression and nonsevere impairments of degenerative disc disease and diabetes. [R. 12, Finding 3.] Additionally, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 13, Finding 4.] Further, the ALJ found Plaintiff's mental impairments, considered singly and in combination, failed to meet or medically equal the criteria of Listings 12.04 and 12.06. [*Id.*] The ALJ found Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). [R. 14, Finding 5.] Specifically, the ALJ found Plaintiff could stand and walk for two hours each of an

---

[3] The Courts notes Plaintiff first filed applications for DIB and SSI in December 2006. [R. 103–10.] The record contains the initial denial of the December 2006 DIB claim [R. 53–56], but the record reflects no other action regarding these first applications—the ALJ did not mention them in her decision and neither Plaintiff nor the Commissioner mentioned these applications in their briefs submitted to this Court.

eight-hour workday; lift and carry a maximum of ten pounds occasionally and less than ten pounds frequently; occasionally climb stairs but never ladders; frequently balance, stoop, crouch, kneel, and crawl; and perform simple, routine, repetitive tasks and instructions. [*Id.*]  The ALJ also found Plaintiff must avoid concentrated exposure to extreme heat, cold, dangerous machinery, and unprotected heights.  [*Id.*]  The ALJ concluded Plaintiff was unable to perform her past relevant work [R. 17, Finding 6], but jobs existed in significant numbers that Plaintiff could perform [R. 17, Finding 10].

Plaintiff requested Appeals Council review of the ALJ's decision [R. 6] and on August 17, 2010, the ALJ's findings became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review of the hearing decision [R. 1–3; 20 C.F.R. §§ 404.981, 416.1481].  Plaintiff filed this action for judicial review on October 11, 2010.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ erred by failing to

(1)    account for the restrictions and limitations caused by Plaintiff's severe sleep apnea, which Dr. Nawabi opined would prevent Plaintiff from performing even sedentary work [Doc. 13 at 23–24; Doc. 16 at 1–3];

(2)    properly analyze and weigh Dr. Cole's opinion, which limited Plaintiff to sedentary work for less than a full eight-hour workday [Doc. 13 at 24–28; Doc. 16 at 3–7];

(3)    address the effects of Plaintiff's obesity [Doc. 13 at 28–29; Doc. 16 at 7–8];

(4)    identify specific occupations Plaintiff could perform [Doc. 13 at 29–30; Doc. 16 at 8–9]; and

(5)    include Plaintiff's deficiencies in concentration, persistence, or pace in the ALJ's hypothetical to the vocational expert [Doc. 13 at 31; Doc. 16 at 9–12].

3

The Commissioner argues the ALJ reasonably weighed the medical evidence [Doc. 14 at 8–11], reasonably identified all of Plaintiff's impairments [*id.* at 11–13], and reasonably found Plaintiff could perform a significant number of jobs [*id.* at 13–16].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result

4

as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See,*

*e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Ashton v. Astrue*, No. 6:10-cv-152, 2010 WL 5478646, at *8 (D.S.C. Nov. 23, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of*

8

*Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of

9

impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

C.      *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

D.      *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[5] with the physical and mental demands of the kind

---

[5]Residual functional capacity is "the most [a claimant] can do despite [his] limitations." 20 C.F.R. §§ 404.1545(e), 416.945(a)(1).

10

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.     *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[6] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the

---

[6]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a; 416.969a. A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. *Id.*

[Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

### III.　　Treating Physicians

The opinion of a claimant's treating physician must "be given great weight and may be disregarded only if there is persuasive contradictory evidence" in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986) (holding that a treating physician's testimony is entitled to great weight because it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time); *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983)). If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence. *Craig*, 76 F.3d at 590. Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See id.* (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the

treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d), 416.927(d).  In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell*, 699 F.2d at 187 (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir.1986).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. §§ 404.1527(e), 416.927(e).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make

a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the Fourth Circuit's "pain rule," it is well established that "subjective complaints of pain and physical discomfort can give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman*, 829 F.2d at 518.  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably

15

be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528,

416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant

to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108

(4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all

administrative law judges within the circuit a policy stating Fourth Circuit law on the subject

of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).

The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

### PLAINTIFF'S MEDICAL HISTORY

On October 27, 2006, Plaintiff, who was approximately 34 weeks pregnant, was admitted to Mary Black Memorial Hospital ("Mary Black") due to hypoxia.[7]  [R. 270.]  She

---

[7] Hypoxia is "a deficiency of oxygen reaching the tissues of the body."  *Hypoxia Definition*, Merriam-Webster.com, http://www. merriam-webster.com/medlineplus/hypoxia (last visited Jan. 12, 2012).

17

had experienced a near syncopal[8] episode while driving her car.  [R. 272.]  After extensive

testing, she was diagnosed with right to left atrial shunt.  [R. 270–71.]  She was discharged

on November 7, 2006 and transferred to the Medical University of South Carolina

("MUSC") due to concerns over her cardiac function during delivery of her child.  [R. 270.]

Plaintiff was admitted to MUSC on November 7, 2006.  [R. 310.]  At MUSC, the

diagnosis of right to left shunt was confirmed [R. 311], and on November 10, 2006,

Plaintiff's child was delivered by cesarean section [R. 312].  The cardiology department felt

Plaintiff was stable for discharge from a cardiac standpoint on November 12, 2006, and

Plaintiff was instructed to follow up with cardiology on November 28.  [R. 313.]  On

November 28, 2006, Dr. Alexander Ellis wrote a letter summarizing Plaintiff's treatment in

the Adult Congenital Cardiology Clinic at MUSC.  [R. 314–15.]  Dr. Ellis noted a heart

catheterization corroborated a large secundum atrial septal defect with a right to left shunt.[9]

---

[8] In other words, Plaintiff nearly lost consciousness due to insufficient blood flow to the brain.  *Syncope Definition*, Merriam-Webster.com, http://www.merriam-webster.com/medlineplus/syncope%5C (last visited Jan. 17, 2012).

[9] As stated in an online publication of the U.S. National Library of Medicine,

> Atrial septal defect (ASD) is a congenital heart defect in which the wall that separates the upper heart chambers (atria) does not close completely. Congenital means the defect is present at birth.
>
> **Causes**
>
> In fetal circulation, there is normally an opening between the two atria (the upper chambers of the heart) to allow blood to bypass the lungs. This opening usually closes around the time the baby is born.
>
> If the ASD is persistent, blood continues to flow from the left to the right atria. This is called a shunt. If too much blood moves to the right side of the heart, pressures in the lungs build up. The shunt can be reversed so that blood flows from right to left. Small atrial septal defects often cause very few problems and may be found much later in life. Many problems can occur if the shunt is large, however. In advanced and severe cases with large shunts the increased pressure on the right side of the heart would result in reversal of blood flow (now from right to left). This usually results in significant

18

[R. 314.]  Dr. Ellis also noted Plaintiff's oxygen saturations did not improve as expected postpartum.  [*Id.*]  Dr. Ellis stated MUSC's Cardiology Clinic planned to perform heart catheterization in December 2006 to reevaluate Plaintiff's condition.  [R. 315.]  Plaintiff underwent the cardiac catheterization at MUSC on December 18, 2006.  [R. 327–31; *see also* R. 371–74 (February 7, 2007 letter from Drs. Ellis and Gregg discussing results).]

On January 4, 2007, Plaintiff consulted with Dr. Kristen Nawabi of Cardiology Consultants regarding the MUSC cardiologist's recommendation that Plaintiff undergo open-heart surgery to repair the atrial septal defect.  [R. 336.]  Plaintiff stated she continued to experience shortness of breath, and Dr. Nawabi noted Plaintiff had edema after the baby was born, which was treated with Lasix.  [*Id.*]  Dr. Nawabi also noted Plaintiff was recently diagnosed with hypertension and continued to feel poorly with malaise, fatigue, and headaches.  [*Id.*]  Dr. Nawabi advised Plaintiff that Dr. Nawabi believed Plaintiff's ongoing symptoms necessitated surgical repair of Plaintiff's atrial septal defect. [R. 338.]

On July 20, 2007, Plaintiff had the atrial septal defect repaired at MUSC by Dr. Fred Crawford, Jr.  [R. 394–96, 405–06.]  Plaintiff had some postoperative complications, including acute renal failure, which improved and returned to normal before her discharge. [R. 422–23, 479.]  On July 31, 2007, Plaintiff went to the emergency room at Mary Black, complaining of shortness of breath of mild to moderate severity that was exacerbated by exertion and lying flat.  [R. 468.]  She was having to sleep sitting up and getting fatigued

shortness of breath.

U.S. Nat'l Library of Med., *Atrial septal defect*, MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/ medlineplus/ency/article/000157.htm (last updated Jan. 10, 2012).

very easily.  [R. 469.]  Plaintiff was given a dose of intravenous Lasix, as well as oral Lasix to try on an outpatient basis.  [*Id.*]  The emergency room physician noted Plaintiff had bilateral swelling in her legs.  [R. 471.]  Plaintiff was instructed to follow up with Dr. Nawabi the following week.  [R. 469.]  Plaintiff followed up with Dr. Nawabi on August 2, 2007.  [R. 575–77.]  Upon examining Plaintiff, Dr. Nawabi noted she was hypertensive and had some swelling in both of her lower extremities but her murmur was markedly improved.  [R. 576.]  Dr. Nawabi instructed Plaintiff to take Lisinopril.  [*Id.*]

At a post-op visit on August 8, 2007, Dr. Crawford noted Plaintiff had done reasonably well at home but that she had been extremely slow to ambulate and had numerous minor complaints, including some shortness of breath and pain in her incision.  [R. 427.]  Dr. Crawford noted, "It is pretty clear that [Plaintiff] has not invested a whole lot of effort into getting well and this is verified by her husband."  [*Id.*]  Her physical exam showed a well-healed incision; diffuse ronchi that clear with coughing; regular heart rhythm; and no detected murmur.  [*Id.*]  Dr. Crawford opined Plaintiff was making a satisfactory recovery but needed to increase her ambulation and activities.  [*Id.*]

On August 13, 2007, Plaintiff returned to the emergency room at Mary Black, complaining of drainage from her incision, that the incision was gaping open, and pain under her right breast.  [R. 455.]  An ECG was abnormal.  [R. 459.]  Plaintiff was diagnosed with delayed wound closure and instructed to follow up with Dr. Crawford the next day.  [R. 460.]

On September 17, 2007, Plaintiff indicated to Dr. Nawabi that she was having no problems with shortness of breath and chest pain; had been walking three miles in about an hour; and had lost fourteen pounds but had continued to have some lower extremity

edema.  [R. 572.]  Dr. Nawabi noted Plaintiff appeared to be clinically stable and her blood pressure had improved.  [R. 573.]

On October 13, 2007, Plaintiff went to the emergency room at Mary Black, complaining of neck, shoulder, and upper chest pain on her left side.  [R. 596.]  She also complained that she was feeling short of breath and weak.  [*Id.*]  Plaintiff was diagnosed with acute bronchitis, given medication, and instructed to follow up with her regular physician in two to three days.  [R. 606.]

On October 23, 2007, Plaintiff presented to Dr. Jack M. Cole, who had last seen Plaintiff in May 2005, complaining of chest discomfort, particularly with a deep breath or sneezing.  [R. 616.]  Plaintiff indicated to Dr. Cole she recently had been in the emergency room complaining of chest tightness of the left upper chest and left shoulder discomfort.  [*Id.*]  Dr. Cole diagnosed Plaintiff with gastrointestinal reflux disease ("GERD") and recent acute bronchitis.  [R. 617.]

On March 12, 2008, Plaintiff presented to Dr. Nawabi, who noted Plaintiff's hypertension and obesity and that she had been unable to lose weight even though she had been walking.  [R. 799.]  Dr. Nawabi further noted Plaintiff was having diffuse body swelling that Lasix was not relieving, snored and woke at night, was fatigued during the day, and had some shortness of breath.  [*Id.*]  A limited echocardiogram showed resolution of Smith's atrial septal defect.  [R. 800.]  Dr. Nawabi also noted that she wondered if Plaintiff had sleep apnea.  [*Id.*]

On March 28, 2008, Plaintiff followed up with Dr. Cole.  [R. 810.]  Dr. Cole noted Plaintiff was having postoperative chest wall pain, intermittent left upper extremity pain, shortness of breath sometimes while at rest and often on exertion, difficulty losing weight,

and swelling in her lower extremities and feet.  [*Id.*]  Dr. Cole noted that, due to moderate pulmonary hypertension, Dr. Nawabi had raised the question of whether Plaintiff had sleep apnea.  [*Id.*]  Therefore, Dr. Cole noted Plaintiff would be referred to Dr. Abreu for pulmonary and likely sleep evaluation.  [R. 809.]

On April 17, 2008, Plaintiff presented to Dr. Alexandre Abreu at North Grove – Upstate Lung ("Upstate Lung") for a sleep disorder consultation.  [R. 770.]  Plaintiff reported having excessive daytime somnolence for months and said it was common for her to doze off while reading or watching television.  [*Id.*]  Dr. Abreu noted there was evidence Plaintiff had gained 80 pounds over the last five years.  [*Id.*]  Dr. Abreu assessed Plaintiff as having excessive daytime somnolence, disruptive ronchopathy, obesity, and pulmonary hypertension.  [R. 773.]  Dr. Abreu ordered an overnight polysomnography to evaluate evidence of sleep disordered breathing, a chest CT angiogram, a Doppler of Plaintiff's lower extremities, and weight loss.  [R. 774.]

On April 22, 2008, Plaintiff underwent a baseline polysomnography exam.  [R. 754–59.]  As interpreted by Dr. Luis De la Cruz, Plaintiff's exam showed her sleep was disturbed by arousal associated with obstructive respiratory events, and sleep architecture revealed reduced sleep efficiency but normal stage REM and N2 sleep.  [R. 755.]  Dr. De la Cruz also interpreted the exam as revealing mild obstructive sleep disordered breathing with hypersomnia, although the degree of sleep disordered breathing could have been underestimated because there was an absence of supine sleep.  [*Id.*]  Dr. De la Cruz recommended Plaintiff maintain a much lower body mass index, avoid alcohol within four hours of her bedtime, and try nasal CPAP, if clinically indicated.  [*Id.*]

On May 6, 2008, Plaintiff underwent a polysomnography exam with nasal CPAP titration. [R. 760–66.] As interpreted by Dr. Abreu, sleep architecture again revealed normal sleep efficiency with reduced stage REM sleep but increased stage N2 sleep. [R. 761.] Further, nasal CPAP was effective at eliminating snoring, flow limited arousals, obstructive hypopnea, and apnea. [*Id.*] Dr. Abreu recommended Plaintiff maintain a much lower body mass index, use nasal CPAP, avoid sedatives unless sleeping with nasal CPAP, and avoid alcohol within four hours of her bedtime. [*Id.*]

On September 30, 2008, Plaintiff presented to Dr. Cole, indicating her gynecologist told her she was borderline diabetic and started her on Metformin. [R. 806.] Dr. Cole noted he did not have the lab data but it sounded as if Plaintiff was being treated as a prediabetic. [*Id.*] Plaintiff also indicated significant malaise and lethargy, as well as problems with her nerves, describing episodes that sounded like panic attacks. [*Id.*] Dr. Cole diagnosed Plaintiff with generalized anxiety disorder. [*Id.*]

On October 15, 2008, Plaintiff reported to Dr. Nawabi she was having some rare palpitations and rare chest pain, with some shortness of breath during the daytime. [R. 794.] Plaintiff also told Dr. Nawabi she had been diagnosed with sleep apnea. [*Id.*] Dr. Nawabi noted that two weeks prior, Plaintiff indicated some significant stress to Dr. Cole, who started Plaintiff on Lexapro. [*Id.*] Plaintiff indicated she was exercising and had lost ten pounds [*id.*], and Dr. Nawabi twice noted Plaintiff would benefit from ongoing weight loss [R. 795].

On October 22, 2008, Dr. Nawabi indicated Plaintiff's echocardiogram results showed normal left ventricular function, left ventricular hypertrophy, mild pulmonary

23

hypertension, and trace to mild mitral insufficiency. [R. 792.] Right heart pressures had improved since the March 2008 echocardiogram. [*Id.*]

Plaintiff continued to present to Upstate Lung through April 2009. [R. 834–60 (office encounters from June 2008–April 2009).] At a visit on April 6, 2009, the examining physician noted Plaintiff had mild obstructive sleep apnea, hypersomnia, delayed phase, insomnia, and chronic pain. [R. 834.] The physician also noted Plaintiff did not tolerate CPAP. [*Id.*] Plaintiff indicated in a questionnaire that she had a high chance of dozing off when sitting and reading, a passenger in a car for an hour without a break, lying down to rest in the afternoon, and sitting quietly after a lunch without alcohol. [R. 836.]

In April 2009, Plaintiff presented to Dr. Nawabi, complaining of left side chest pain radiating into her right arm and back. [R. 866.] Dr. Nawabi noted Plaintiff was experiencing anxiety attacks and that her blood pressure was fluxuating. [*Id.*] Plaintiff claimed she was exercising 30 minutes most days but was not losing weight. [*Id.*] Dr. Nawabi also noted Plaintiff had been intolerant of CPAP and started noting daytime fatigue again, but Plaintiff was not experiencing significant chest pain. [*Id.*] Dr. Nawabi noted that because Plaintiff was having episodes of tachycardia, Dr. Nawabi would place Plaintiff on a 30-day event monitor to determine the cause of Plaintiff's symptoms. [R. 867.]

On June 5, 2009, Plaintiff presented to Dr. Nawabi for a stress echocardiogram to further evaluate Plaitniff's exertional dyspnea and atypical chest pain. [R. 864.] A Holter monitor worn from April 24, 2009 to May 24, 2009, however, showed underlying sinus

rhythm and no sinus tachycardia[10] or supraventricular tachycardia.[11] [*Id.*] Plaintiff then underwent a standard Bruce protocol stress test, which was negative with rather pronounced dyspnea. [R. 862–63.]

After Plaintiff's visit on April 27, 2009, Dr. Cole raised some question as to whether Plaintiff could work:

> There is some question as to whether she would be able to work. I do not think that she could perform any type of a physical job that required a lot of lifting, carrying or pushing as most of her difficulty is in her upper extremities. She might be able to perform a sedentary job with only a limited amount of walking or standing and certainly no strenuous carrying, etc. I do not think that she really has any diagnoses that would account for difficulty with concentration or carrying out any job activities on a mental/intellectual basis.

[R. 871.] Subsequently, in July 2009, Dr. Cole noted Plaintiff had consistently complained to him of fatigue; shortness of breath on exertion; pain; and muscle spasms in her neck and upper back. [R. 878.] He indicated Plaintiff likely had adapted to her chronic fatigue by cutting back on activities and that her neck pain could be related to the degenerative disc disease in her cervical spine. [*Id.*] Further, Dr. Cole opined,

> [Plaintiff] would be limited to working at no more than a sedentary job in that she would not be able to walk or stand in combination for more than two hours out of an eight hour work day primarily because of the fatigue and shortness of breath that she experiences in relation to her cardiac issues. Even at

---

[10] Sinus tachycardia is abnormally rapid sinus rhythm. *Sinus Tachycardia Definition*, Merriam-Webster.com, http://www.merriam-webster.com/medlineplus/sinus%20tachycardia (last visited Jan. 13, 2012).

[11] "Supraventricular tachycardia (SVT) is a general term that refers to any rapid heart rhythm originating above the ventricular tissue. Supraventricular tachycardias can be contrasted to the potentially more dangerous ventricular tachycardias - rapid rhythms that originate within the ventricular tissue." *Supraventricular tachycardia*, Wikipedia.org, http://en.wikipedia.org/wiki/Supraventricular_tachycardia (last visited Jan. 13, 2012).

a sedentary job, I feel that she would have pain continuously throughout the day.  It would be hard for her to work a full eight hour day.  She might be able to work at a sedentary job for 3–4 hours a day.

It would be consistent with her condition that even at [a] sedentary job, the pain that she feels in her neck and upper back would lead to frequent interruptions to her concentration.  Many of the medications that she would need to take for this pain would be too sedating to allow her to concentrate on tasks persistently. . . .  Also, even at a sedentary job, it would be consistent with her condition that she would have difficulty holding up her head to do something such as looking at a computer screen, or looking down at what she was doing on a table, due to fatigue and pain that she would feel in these neck and upper back muscles on holding up her head for long periods of time.  For this reason, I think she would need to rest away from the work station for more than one hour out of an eight hour work day, even at a sedentary job.

[R. 878–79.]

Dr. Nawabi opined in September 2009 that,

[f]rom a cardiopulmonary standpoint, we have good solid objective tests that show that [Plaintiff] is going to have a lot of problems standing and walking and is simply not going to be able to persist at this type activity for more than briefly during the work day.  I would expect she would be able to get up, get dressed, and get into a work station provided she could sit for essentially all of the work day from a cardiopulmonary standpoint.  Of course she has sleep apnea and this raises the question of whether she could work at all, since it is very possible that she might fall asleep if she had to sit for long periods of time.  However, you will have to talk to Dr. Mendoza about that question.

[R. 880.]  There is also evidence that, in 2009, Plaintiff attended therapy at WestGate Training and Consultation Network following a referral from Spartanburg Mental Health.  [R. 877.]  The service provider felt Plaintiff's symptoms were representative of adjustment disorder with depressed mood.  [*Id.*]

26

## STATE AGENCY ASSESSMENTS

On September 12, 2007, the South Carolina Department of Health and Environmental Service's Home Health Services completed an assessment of Plaintiff's abilities. [R. 483–89.] The assessment concluded Plaintiff required assistance from her family members several times during the day to complete her activities of daily living, such as getting her medication and meals, and doing her housekeeping, laundry, shopping, and finances. [R. 484.] The assessment indicated Plaintiff had daily pain, but it was not constant. [*Id.*] The assessment noted Plaintiff was short of breath when walking more than twenty feet or climbing stairs. [R. 485.]

On November 27, 2007, Carl Anderson, a non-examining State agency consultant, completed a physical residual functional capacity assessment of Plaintiff's abilities. [R. 716–23.] Mr. Anderson assessed Plaintiff would be able to occasionally lift 20 pounds, frequently lift ten pounds, and could stand, walk, or sit for a total of six hours of an eight-hour workday. [R. 717.] Mr. Anderson noted Plaintiff was morbidly obese. [*Id.*] Mr. Anderson assessed Plaintiff should never climb ladders, ropes, or scaffolds [R. 718]; could only occasionally climb ramps or stairs [*id.*]; and should avoid concentrated exposure to extreme cold, heat, and hazards such as machinery and heights [R. 720].

On February 12, 2008, William Hopkins, a non-examining State agency consultant, completed a physical residual functional capacity assessment of Plaintiff's abilities. [R. 736–43.] Mr. Hopkins assessed Plaintiff would be able to occasionally lift 20 pounds, frequently lift ten pounds, and could stand, walk, or sit for a total of six hours of an eight-hour workday. [R. 737.] Mr. Hopkins assessed Plaintiff had no postural limitations,

no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  [R. 738–40.]

**APPLICATION AND ANALYSIS**

**Consideration of Sleep Apnea**

Plaintiff first contends the ALJ failed to account for restrictions and limitations caused by Plaintiff's severe sleep apnea, which Dr. Nawabi opined would prevent Plaintiff from performing even sedentary work.  [Doc. 13 at 23–24; Doc. 16 at 1–3.]   The Court disagrees.

In assessing Plaintiff's residual functional capacity ("RFC"), the ALJ specifically considered Plaintiff's sleep apnea, which the ALJ found to be severe but not disabling.  [R. 16.]  Specifically, the ALJ noted objective evidence of record revealed Plaintiff was doing better on her current nasal CPAP and had only mild apnea.  [*Id.* (citing R. 794).]  While evidence in the record also showed Plaintiff was in poor compliance with her CPAP and had not been able to tolerate her CPAP more than a few hours per week, her sleep apnea was consistently described as "mild."  [R. 834, 837, 895.]

Further, the Court finds Plaintiff's representation of Dr. Nawabi's opinion is misleading.  Dr. Nawabi did not find, as argued by Plaintiff, that Plaintiff "would not be able to engage in even sedentary work due to the effects of her sleep apnea."  [Doc. 13 at 23.]  Rather, Dr. Nawabi opined the sleep apnea diagnosis "raise[d] the question of whether [Plaintiff] could work at all, since it is very possible that she might fall asleep if she had to sit for long periods of time," but Dr. Nawabi noted she could not answer the question of whether Plaintiff's sleep apnea precluded Plaintiff from working and deferred to Plaintiff's

28

pulmonologist. [R. 880.] Plaintiff has failed to point to any opinion by any doctor from Upstate Lung, where Plaintiff underwent sleep apnea testing and treatment, regarding any limitations Plaintiff may have as a result of sleep apnea. Accordingly, the Court finds the ALJ's decision to exclude any further limitation resulting from Plaintiff's sleep apnea is supported by substantial evidence.

**Analysis of and Weight Assigned to Dr. Cole's Opinion**

Plaintiff next argues the ALJ erred by failing to properly analyze and weigh Dr. Cole's opinion, which, in part, limited Plaintiff to sedentary work for less than a full eight-hour workday. [Doc. 13 at 24–28; Doc. 16 at 3–7.] Specifically, Plaintiff alleges the ALJ, in contravention of 20 C.F.R. § 404.1527, failed to explain why she discounted Dr. Cole's opinion. As explained below, the Court concludes that any lack of explanation regarding the weight the ALJ gave Dr. Cole's opinion is harmless error because the weight given to Dr. Cole's opinion is supported by substantial evidence.

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with

29

other evidence, *Craig*, 76 F.3d at 590, "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position," *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Finally, the ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairment or impairments meets or equals a listing, or the claimant has a certain residual functional capacity. 20 C.F.R. § 1527(e).

Here, the ALJ properly evaluated the opinion of Dr. Cole and substantial evidence supports the ALJ's rejection of Dr. Cole's opinion that Plaintiff would have trouble working a full eight-hour workday and "might be able to work at a sedentary job for 3–4 hours a day." [R. 878.] While the ALJ did not explicitly state her reasons for discounting this portion of Dr. Cole's opinion,[12] the ALJ did explain that (1) Dr. Cole's opinion was based on Plaintiff's subjective allegations, which the ALJ discredited to the extent Plaintiff's allegations were inconsistent with the ALJ's RFC assessment, and (2) Plaintiff's activities of daily living did not indicate significant limitations—Plaintiff was even advised to increase her ambulation and activities. [R. 17.] Upon review of the ALJ's decision, the Court finds the ALJ adequately indicated and explained the weight she assigned to Dr. Cole's opinion

---

[12] To an extent, Plaintiff also contends the ALJ failed to discuss and weight Dr. Cole's opinion with respect to limitations based on Plaintiff's mental abilities. [Doc. 13 at 25; Doc. 16 at 3.] Plaintiff states Dr. Cole opined Plaintiff would have difficulty with "concentration or carrying out any job activities on a mental/intellectual basis." [Doc. 13 at 25.] However, upon review of the record, the Court finds Plaintiff misstates Dr. Cole's opinion; Dr. Cole actually opined, "I do *not* think that [Plaintiff] really has any diagnoses that would account for difficulty with concentration or carrying out any job activities on a mental/intellectual basis." [R. 871.] Dr. Cole concluded in an opinion given three months later that Plaintiff's *pain* in her neck and back, as well as her *medications*—not Plaintiff's mental ability—would cause frequent interruptions in her ability to concentrate such that "she would need to rest away from the work station for more than one hour out of an eight-hour work day, even at a sedentary job." [R. 878–79.] Therefore, the Court does not address Plaintiff's assignment of error to the extent that it is based on a misstatement of Dr. Cole's opinion regarding Plaintiff's mental abilities.

and that any failure to explicitly analyze Dr. Cole's opinion pursuant to 20 C.F.R. § 404.1527 is harmless error. *See, e.g.*, *Perdue v. Astrue*, 2011 WL 6415490, at *17 (S.D.W. Va. Dec. 21, 2011) ("[C]ourts have applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand would be merely a waste of time and money. In general, remand of a procedurally deficient decision is not necessary absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses . . . [, which] constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." (internal quotation marks and citation omitted)); *see also Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached." (internal quotation marks and citation omitted)).

Moreover, substantial evidence supports the ALJ's decision that Plaintiff could perform a limited sedentary job for a full workday. First, only Dr. Cole opined Plaintiff would be unable to work an eight-hour workday—no other treating physician or State agency consultant gave a similar opinion. Second, Dr. Cole's treatment notes contain no indication that Plaintiff would be so limited; his opinion as to Plaintiff's ability to work a full day is only contained in an opinion letter [R. 878–79]. Third, while Dr. Nawabi opined Plaintiff's sleep apnea may affect her ability to work, Dr. Nawabi deferred to the opinion of the doctor who treated Plaintiff's sleep apnea, which contains no indication that Plaintiff's

31

sleep apnea would affect her ability to work an eight-hour day. As stated above, the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence. *Craig*, 76 F.3d at 590. Upon review of the record, the Court concludes the ALJ's decision to discount a portion of Dr. Cole's opinion is supported by substantial evidence such that any error assignable to the ALJ's failure to indicate the weight she gave to Dr. Cole's opinion is harmless error.

**Consideration of Obesity**

Plaintiff next contends the ALJ failed to consider the enhancing effect of Plaintiff's obesity at each stage of the five-step sequential evaluation process in violation of SSR 02-1p. [Doc. 13 at 28–29; Doc. 16 at 7–8.] The Court disagrees.

The Court finds the ALJ considered Plaintiff's complaints related to obesity because the ALJ largely adopted the limitations suggested by Plaintiff's physicians and the consultative examiners.[13] *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (finding the ALJ's adoption of physicians' conclusions, when the physicians were aware of the claimant's "obvious obesity," constituted satisfactory consideration of the claimant's obesity and declining to remand the case because explicitly considering the claimant's obesity would not affect the outcome of the case). Moreover, while obesity can cause limitation in exertional and postural functions such as sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, the ability to manipulate, and the ability to tolerate environmental extremes, SSR 02-1p, 67 Fed. Reg. 57,859-02, 57,862 (Sept. 12, 2002), there is no evidence Plaintiff's alleged obesity ever

---

[13] As explained above, the ALJ discredited physicians' limitations to the extent they suggested Plaintiff could not perform sedentary work for a full eight-hour workday.

produced exertional limitations upon Plaintiff's abilities. Rather, the record reflects Plaintiff's limitations largely stemmed from her heart problems. Consequently, any error resulting from the ALJ's failure to explicitly consider Plaintiff's alleged obesity is harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding harmless error where the ALJ did not address the claimant's obesity but did adopt the limitations suggested by the specialists and reviewing physicians, who were aware of the claimant's obesity); *Elder v. Astrue*, No. 3:09-2365, 2010 WL 3980105, at *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements, provide [evidence of the effect on her functioning or ability to work resulting from] her obesity, any failure of the ALJ to explicitly address [the claimant]'s obesity is only harmless error.").

**Identification of Specific Jobs Plaintiff Could Perform**

Next, Plaintiff argues that, without identifying specific jobs that can be referenced by DOT classification, the ALJ's decision that Plaintiff can perform other work is not supported by substantial evidence. [Doc. 13 at 29–30; Doc. 16 at 8–9.] The Court disagrees.

According to Plaintiff, the Fourth Circuit requires the Commissioner to identify specific jobs so that the claimant has an opportunity to "'fairly challenge their specific suitability for and availability to him.'" [Doc. 13 at 30 (quoting *Hall v. Harris*, 658 F.2d 260, 267 (4th Cir. 1981))]. The Court finds Plaintiff has taken the Fourth Circuit's statement in *Hall* out of context, and the issue the court considered in *Hall* is different from the issue raised by Plaintiff. In *Hall*, the Fourth Circuit was confronted with how a claimant's burden and the Commissioner's burden were affected by the recent promulgation of the Social

Security regulations.   658 F.2d at 264.   In particular, the claimant questioned the Commissioner's use of the Medical-Vocational Guidelines ("the Grids") to meet his burden of showing the existence of specific types of jobs available in the national economy and suitable for the claimant.   *Id.* at 267.   The Fourth Circuit noted that, under the new regulations, the Grids allowed the Commissioner to meet his burden by taking administrative notice of the existence of jobs at various functional levels and relieved the Commissioner from any burden to identify specific alternative jobs—when the Grids were applicable.   *Id.*   In analyzing the claimant's argument, the court stated,

> This court, with others, has "agreed that the [Commissioner] may administratively notice the existence of such jobs in the economy, (but) facts pertaining to the capacity of a specific individual can be supplied only by particularized proof."   *Taylor v. Weinberger*, 512 F.2d at 668 (footnote omitted).   Accordingly we have in the past required the [Commissioner] to identify specific alternative jobs so that the claimant might fairly challenge their specific suitability for and availability to him. *See generally* 3 K. Davis, Administrative Law Treatise § 15.18, at 198-206 (2d ed. 1980).   This proof ordinarily required expert vocational testimony.   *Smith v. Califano*, 592 F.2d [1235,] 1236 [(4th Cir. 1979)].   Use of the tables, therefore, raises two questions about the compatibility of the new regulations with the case law: the extent to which the regulations dispense with expert vocational testimony and whether the [Commissioner] must still provide the claimant with specific job titles.

*Id.* at 267–68 (footnote omitted).   The court concluded,

> Our own recent decision by a divided panel in *Frady v. Harris*, 646 F.2d 143 [(4th Cir. 1981)], technically precludes consideration by this panel of the claimant's general challenge to the use of the tables to make directed conclusions of nondisability.   We observe, however, that in *Frady* this court was careful to limit its approval of the tables' use to the specific facts there presented.   Any resulting uncertainty on the point may, of course, be avoided in this case if upon remand a

> vocational expert's testimony is received on the question
> whether claimant is able to perform specific alternative jobs
> available in the national economy.

*Id.* at 268.  Accordingly, the Court finds Plaintiff's interpretation of *Hall* is inapposite.

As indicated by the Fourth Circuit in *Hall*, a vocational expert's testimony regarding jobs available to the claimant can establish the "specific jobs" available to the claimant. *See id.*  The Dictionary of Occupational Titles ("DOT") may also indicate the jobs available to a claimant.  *See* Security Ruling (SSR) 00–4p, 65 Fed. Reg. 75,759–01, at 75,760 (Dec. 4, 2000) ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO)]) for information about the requirements of work in the national economy. . . . We may also use [vocational experts ("VEs")] and [vocational specialists ("VSs")] . . . to resolve complex vocational issues.").  The ALJ has a duty to resolve any conflicts between the DOT and VE testimony:

> Occupational evidence provided by a VE or VS generally
> should be consistent with the occupational information
> supplied by the DOT. When there is an apparent unresolved
> conflict between VE or VS evidence and the DOT, the
> adjudicator must elicit a reasonable explanation for the conflict
> before relying on the VE or VS evidence to support a
> determination or decision about whether the claimant is
> disabled. At the hearings level, as part of the adjudicator's duty
> to fully develop the record, the adjudicator will inquire, on the
> record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically
> "trumps" when there is a conflict. The adjudicator must resolve
> the conflict by determining if the explanation given by the VE
> or VS is reasonable and provides a basis for relying on the VE
> or VS testimony rather than on the DOT information.

*Id.*; *see also Fisher v. Barnhart*, 181 F. App'x 359, 365–67 (4th Cir. 2006) (unpublished opinion) (analyzing a claimant's argument that the ALJ erred by relying on the VE's testimony without first obtaining a reasonable explanation for conflicts between the VE's testimony and the DOT).

Here, a review of the record reveals the ALJ stated that the VE's testimony was consistent with the DOT, and the VE identified jobs by DOT number that Plaintiff could perform. The VE testified, in response to a hypothetical based on the ALJ's RFC assessment, that work would be available to Plaintiff. [R. 40.] Specifically, the VE testified

> there would be clerk occupations, order clerk, information clerk, etcetera. But there would be approximately 2500 in the upstate area, but one million jobs on a national basis. But the DOT number would be 237.367-018. There would be inspector jobs. The DOT number 726.684-050. There would be 2100 in the upstate area, 472,000 on a national basis.

[*Id.*] In her decision, the ALJ concluded

> The vocational expert testified that given all these factors the individual would be able to perform the requirements of representative occupations at the unskilled level such as order and information clerks with 2500 jobs in the upstate and 1 million jobs nationally; inspector 2100 jobs in the upstate and 472,000 jobs nationally.
>
> Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

[R. 18.] Based on the similarity of the VE's testimony and the ALJ's decision, the Court concludes the ALJ found Plaintiff could perform the jobs identified by the VE, which the VE

identified by DOT number.  Accordingly, the Court finds Plaintiff's argument that the ALJ failed to sufficiently identify specific jobs Plaintiff could perform is without merit.[14]

**Hypothetical to Vocational Expert**

Lastly, Plaintiff contends the ALJ erred by failing to include Plaintiff's deficiencies in concentration, persistence, or pace in the ALJ's hypothetical to the VE.  [Doc. 13 at 31; Doc. 16 at 9–12.]  Specifically, Plaintiff contends the ALJ found Plaintiff had moderate difficulties with concentration, persistence, or pace but failed to include this limitation in the hypothetical posed to the VE.  The Court disagrees that the ALJ erred by failing to include this limitation.

"[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."  *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (holding the ALJ accurately characterized the claimant's impairments where the ALJ's hypothetical failed to include the claimant suffered from deficiencies in concentration, persistence, or pace because the ALJ incorporated concrete restrictions identified by an examining psychiatrist and relied on the testimony of four physicians who found the claimant's concentration problems were minimal or negligible); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("The functional capacity assessment, prepared by [the State agency psychological consultant] . . . , describes [the plaintiff] as being 'able to sustain sufficient concentration

---

[14] Plaintiff only argues the ALJ failed to specifically identify jobs Plaintiff could perform; Plaintiff has failed to argue she cannot perform the jobs identified by the VE, and therefore, the Court has limited its discussion to the issue raised by Plaintiff.

and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function.'  Based on this record, the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [the plaintiff]'s deficiencies in concentration, persistence or pace.")).  Here, the ALJ assessed Plaintiff had the residual functional capacity to perform simple, routine, repetitive tasks and instructions.  [R. 14.]  The medical evidence indicates only that Plaintiff may have difficulty concentrating due to her neck and back pain [R. 878 (opinion of Dr. Cole)]; however, as explained above, the ALJ properly explained why she discredited this medical evidence to the extent that Dr. Cole opined Plaintiff would be precluded from performing sedentary work.

In her hypothetical to the VE, the ALJ included the limitations she assessed as part of Plaintiff's RFC, asking the VE whether work existed for a claimant who was limited to unskilled work with simple, repetitive tasks and instructions.  [R. 40.]  Because the ALJ's assessment of Plaintiff's restrictions that are related to concentration, persistence, or pace is supported by the medical evidence and the ALJ posed a hypothetical to the VE containing the ALJ's assessment of these restrictions, the Court finds Plaintiff's argument with respect to this issue is without merit.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be AFFIRMED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

38

January 18, 2012
Greenville, South Carolina